# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **IRENE COMFORT WEIR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case number 4:04cv0571 TCM** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405 (g) for judicial review of the final decision of Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying Irene Comfort Weir's application for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383b. Ms. Weir ("Plaintiff") has filed a brief in support of her complaint; the Commissioner has filed a brief in support of her answer.[1]

## Procedural History

Plaintiff applied for SSI in March 2000, alleging a disability since January 1986[2] caused by anxiety, stress, hallucinations, obesity, and hip and back problems. (R. at 108-10.)[3] Her application was denied. (Id. at 35, 95-99.) Subsequently, a hearing was held, at

---

[1]The case is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c).

[2]This onset date was later amended to March 1, 2000.

[3]References to "R." are to the administrative record filed by the Commissioner with her answer.

Plaintiff's request, in January 2001 before Administrative Law Judge ("ALJ") Julian D. Cosentino. (Id. at 361-80.) The ALJ determined that Plaintiff was not under a disability at any time on or before the date of his decision, and denied her application. (Id. at 26-34.) The Appeals Council granted Plaintiff's request for review of that decision and remanded her application for further evaluation of her mental impairments, further consideration of her residual functional capacity, and further development of the record. (Id. at 79-81.)

In April 2003, a second administrative hearing was held before ALJ Joseph E. Simone. (Id. at 393-448.) The ALJ concluded that Plaintiff was not disabled within the meaning of the Act and denied her application. (Id. at 11-22.) The Appeals Council denied review of that decision, effectively adopting the decision as the final decision of the Commissioner. (Id. at 3-5.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the first administrative hearing.

Plaintiff testified she was born on September 13, 1971, and was then 29 years old. (Id. at 364.) She completed the eighth grade and has her GED. (Id.) She was right-handed, 5 feet 6 inches tall, and weighed 287 pounds. (Id. at 365.) She lived with her husband and two daughters, ages six and three. (Id. at 369.) She and her husband were home schooling the older daughter until she was accepted into a magnet school. (Id. at 369-70.) Her husband, 35 years of age, was disabled due to complications of diabetes and had to use a walker. (Id. at 374.)

The longest job she had held was at Steak n' Shake. (<u>Id.</u> at 366.) She left that job after fighting with the district manager. (<u>Id.</u>) She was fired from her job at the laundromat after fighting with her boss. (<u>Id.</u>) She left her job at another restaurant, Denny's, after going into labor and left her job at K-Mart after having a panic attack. (<u>Id.</u>) When working, she had problems with instructions. (<u>Id.</u> at 378.)

Asked to describe her current problems, Plaintiff reported that she saw things that were not there, heard voices that were not in the room, and had headaches, nausea, dizzy spells, sweats, shakes, shortness of breath, and pains in her chest, back, and legs. (<u>Id.</u> at 366.) These problems began when she was in grade school. (<u>Id.</u> at 367.) She first started vomiting blood and later became violent. (<u>Id.</u>) In school, she had difficulties with some of the teachers and some of the work. (<u>Id.</u>) She also had difficulties with her family. (<u>Id.</u>) She avoided crowds. (<u>Id.</u> at 375.) Someone went with her to the store. (<u>Id.</u> at 376.) She had difficulty controlling her temper with adults, a simple grunt could set her off. (<u>Id.</u>)

Additionally, Plaintiff had an erratic sleep pattern; she either slept too little or too much. (<u>Id.</u> at 374.) Anxiety made the voices she heard worse, and she had visual hallucinations approximately ten times a day. (<u>Id.</u> at 375.) These visions were sometimes shapes and sometimes animals or people. (<u>Id.</u>) The visions sometimes communicated with her. (<u>Id.</u>)

Plaintiff was then seeing a doctor, Dr. Kosuri,[4] at Great Rivers. (Id. at 367, 373.) He had prescribed Prozac for her. (Id. at 373.) She had been in Children's Hospital when she was 16 and had since been to Lutheran Family Services, Jewish Family Services, a Catholic organization, and Drs. Scott and Ahmad, both psychiatrists. (Id. at 368.) She had also been in St. Anthony's Center for stress when she was 18 years old. (Id. at 369.) She had been seeing Dr. Merit for her asthma, weight, wrist, and back. (Id. at 368.) Recently she had been to the emergency room after having a major anxiety attack. (Id.) Although she had not attempted suicide since she was 16 years old, she had thought of doing so the previous Halloween. (Id. at 377.) She did engage in self-mutilation and cut her leg on Halloween. (Id. at 378.)

During the day, she cleaned, did laundry, read, did art work, and took walks, in addition to the home schooling. (Id. at 369.) She also watched television with her husband, listened to the radio, and talked with relatives and a friend over the telephone. (Id. at 372.) Friends took her and her husband to go grocery shopping and helped out sometimes with money or extra food. (Id. at 371.) She had problems being on her feet for longer than 30 minutes. (Id. at 372.) She walked the dog around the block every day. (Id. at 377.)

Plaintiff appeared in February 2003 for a second hearing, in addition to Dr. Allan G. Barclay, Ph.D., a medical expert, and Dr. Art Smith, a vocational expert. Plaintiff's attorney explained at the beginning of the hearing that Plaintiff had been under treatment with a Dr.

---

[4]In the transcript the doctor's name is spelled "Kauri." The correct spelling is "Kosuri."

Kabir, a psychiatrist, since January 2003. (Id. at 385.) She had not yet been able to get his treatment notes. (Id.) A question arose whether Plaintiff had been receiving any psychiatric care between 2000 and 2003. (Id. at 387.) She replied that she had been. (Id. at 388.) The case was then reset for her attorney to obtain and submit those records.

The hearing was reconvened in April. (Id. at 393.) Plaintiff, her attorney, Dr. Barclay, and Jeffrey Magrowski, Ph.D., a vocational expert, were present. New evidence, specifically Dr. Kabir's treatment notes, notes from Plaintiff's current psychiatrist, Dr. Gabriel, notes from a Dr. Seria, and a medical source statement from Velma Chewe, a licensed social worker, were submitted. The ALJ expressed his concern that Dr. Kabir's notes were illegible. Plaintiff's attorney explained that those notes were all he was willing to provide. The ALJ also framed the issue as one of Plaintiff's mental impairments. Her attorney agreed.

In response to questions by her attorney, Plaintiff reported that she was then living with her mother, her husband, her two children, and her uncle. (Id. at 401-02.) She was taking a reading college course two days a week, for an hour each day. (Id. at 403.) She would like to get a degree in adolescent art therapy. (Id. at 404.) She had stopped home schooling her oldest child, and both children were now in school. (Id.) When she was home schooling, she would spend four hours each day doing so and would also do research at the library. (Id. at 405.) Her oldest child was on the honor roll. (Id.)

Plaintiff did not have a driver's license, but did get her learner's permit on her last birthday.  (Id.)  She does not have a car, however, and driving terrifies her because she is afraid that she will hurt someone.  (Id. at 406.)

She has severe hip and lower back pain, asthma, and diabetes mellitus.  (Id. at 406, 409.)  She has lost 25 to 30 pounds.  (Id. at 409.)  Her appetite was diminished, and it had been a week since she did any binge eating.  (Id. at 417.)  She had stopped smoking because of her asthma, but then had started again after she moved in with her mother.  (Id. at 409-10.)  Plaintiff sleeps eight to ten hours each night and sometimes takes a one or two hour nap during the day.  (Id. at 410.)  Every other night, she has nightmares that wake her up.  (Id.)  She feels sad a lot of the time.  (Id. at 417.)  She sporadically has panic attacks, causing her chest to feel tight and her vision to be blurred.  (Id. at 418.)  Plaintiff has trouble remembering simple things.  (Id. at 417.)  She has to write down appointments.  (Id.)

She and her husband share the cooking and the shopping, he in a wheelchair and she walking.  (Id. at 413.)  She does the laundry.  (Id. at 414.)  She and her husband are getting along better and argue only once a week.  (Id. at 415.)  She also argues with her mother approximately once a week.  (Id.)

Plaintiff testified that she stopped using street drugs the year before.  (Id. at 443-44.) She had not used LSD since before her first child was conceived.  (Id. at 444.)  She last had a drink on New Year's Eve.  (Id. at 445.)  She smoked one and one-half packs of cigarettes a day.  (Id.)  She is trying to cut back because the smoking exacerbates her asthma.  (Id. at 446.)  She last engaged in self-mutilating behavior the Thanksgiving before last.  (Id.)  And,

everyday she sees celestial beings.  (Id.)  Her dosage of Prozac was recently increased, and that and the Seroquel made her tired.  (Id. at 447.)

Dr. Barclay testified that he was a licensed psychologist and was employed at the Gateway Regional Medical Center in Granite City, Illinois.  (Id. at 419.)  He stated that there was sufficient data in the file for him to draw a conclusion about Plaintiff's mental impairments.  (Id. at 421.)

Dr. Barclay testified that Plaintiff did not satisfy the requirements of Listing 12.04 (affective disorders) because there was no medically documented persistence of anhedonia,[5] psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, or thought disturbance.  (Id. at 422.)  Her current testimony eliminated the issue of sleep disturbance.  (Id.)  Dr. Barclay was not convinced that the reported suicide attempts were credible, or that she had visual and auditory hallucinations.  (Id.)  He found no evidence of a marked limitation of activities of daily living, social functioning, or concentration, persistence, and pace.  (Id. at 424.)  He further testified that he found no evidence to support Ms. Chewe's conclusion that Plaintiff had a marked inability to cope with normal work stress, to maintain regular attendance, to be punctual, and to work in coordination with others.  (Id. at 426-27.)  He concluded that Plaintiff did not have a mental impairment that was of any listing-level severity.  (Id. at 423.)

---

[5]"Anhedonia" is defined as the "[a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable."  Stedman's Medical Dictionary 90 (26th ed. 1995).

Plaintiff's attorney questioned Dr. Barclay about Listing 12.08 (personality disorders). (Id. at 427.) He replied that it was his opinion that Plaintiff did not satisfy that listing. (Id.) There was no evidence of seclusiveness or autistic thinking; no pathologically inappropriate suspiciousness or hostility; no oddities of thought, perception, speech and behavior; no persistent disturbance of mood or affect; no pathological dependence, passivity, or aggressivity; no intense and unstable personal relationships; and no impulsive behavior. (Id. at 427-28.) Asked why he did not find the reports of visual and auditory hallucinations credible, Dr. Barclay replied that there was no report from a credible source that they had observed Plaintiff talking to people who were not there or responding to voices with no visible source. (Id. at 428.) He also considered that the reports of hallucinations might be related to Plaintiff's past use of acid, or lysergic acid diethylamide ("LSD"). (Id.) Medications currently prescribed for Plaintiff, Risperdal and Seroquel, were indicated for the relief of some symptoms associated with depression, in addition to the treatment of psychosis. (Id. at 429.) He found no evidence in the record to support a diagnosis of borderline personality disorder, noting that Plaintiff's requirement that her husband accompany her when shopping could reflect a mutually supportive relationship characteristic of marriage. (Id. at 429-30.) He also found no evidence in the record that Plaintiff was still engaging in self-mutilation. (Id. at 430.) The issue of someone who continued to smoke although she had asthma was one of medical compliance. (Id. at 431.)

Dr. Magrowski testified as a vocational expert. The ALJ asked him to assume the following hypothetical person:

> She alleges depression and anxiety and panic attacks bu [sic] she testified that she takes care as well as she can of her disabled husband. She does some cooking, shopping. She does the laundry. She testified that she can lift 30 pounds. She goes to college. She gets A's and B's. She's taking courses now in mathematics – I'm sorry – reading, and she took a course in mathematics, has about 16 hours of college credits. She is able to answer questions – simple questions. She got along with her fellow workers when she was working. Assume her testimony alone without evening talking about Dr. Barclay's testimony or the medical expert, in your opinion, could such a person go back to any past relevant work or do anything else in the national economy?

(Id. at 435-36.) Dr. Magrowski testified that there were such jobs, specifically, those of a packer, office helper, fast-food worker, assembler, or personal attendant, and that 10,000 of these jobs existed in the St. Louis area. (Id. at 436.) These jobs ranged from light and sedentary to some medium work. (Id. at 437.) These jobs should also be low-stress. (Id. at 438.) Dr. Barclay's testimony did not preclude these jobs. (Id. at 437.) Ms. Crewe's assessment did, however, preclude such jobs. (Id.) Panic attacks that interfered with someone's ability to maintain a work schedule would also preclude a job. (Id. at 440.) Dr. Magrowski further testified that Plaintiff's ability to concentrate for four hours in a classroom was far greater than the requirements of an unskilled job. (Id. at 443.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed by Plaintiff as part of the application process; documents generated pursuant to that record; medical records; and medical evaluation reports.

On a pain questionnaire, Plaintiff described her pain as a sharp pain in her hip, a dull pain in her lower back, a shooting pain down her legs, and a throbbing pain in her stomach.

(Id. at 142.)  She was always in pain; however, it became worse when she walked, stood, or sat, or when she engaged in such activities as cleaning or giving her children a bath.  (Id.)  The pain started in her neck and lower back, spread down her back and into her legs, and also into her scalp and chest.  (Id.)  When the pain was bad, nothing helped, including lying down.  (Id.)  Pain killers kept her awake.  (Id.)  And, she was out of medication.

In a claimant questionnaire, Plaintiff explained that when she was younger she would hurt herself or others when she was angry.  (Id. at 143.)  She now ate when she was angry and she was obese.  (Id.)  She has heard voices all her life, and the voices have aged with her.  (Id.)  Her back has hurt for seven years.  (Id.)  Stress makes her stomach pain unbearable.  (Id.)  Other than medication – she was taking Prozac, Risperdal, Albuterol, and Maalox – she sang, did art, cleaned, ate, slept, and meditated to relieve her pain.  (Id.)  She sometimes did not take medication if she forgot or could not afford the co-pay.  (Id.)  Her impairments have left her unable to walk long distances, concentrate, keep her house clean, or have fun.  (Id. at 144.)  She did not like to go shopping without another adult to help her.  (Id.)  When she did, she heard voices.  (Id.)  She gets bored watching television and falls asleep.  (Id. at 145.)  She did not have a driver's license because no one would take her to take the written test.  (Id.)  When she goes out, she goes to church, the art museum, the botanical gardens, her neighbor's house, or her aunts' house.  (Id.)  She did not like to be in a crowd because people annoyed her "to hell and back."  (Id.)  Also, the voices were worse in public.  (Id.)

On a "Work Background" form, Plaintiff listed eight employers for the years from 1987 to 2000. (Id. at 115.) Except for her last job at a discount store and one at a warehouse, each job was as at a restaurant, working either as a waitress or bus person. (Id.)

In a March 2000 disability report, Plaintiff listed her impairments as anxiety, stress, weight, anger, memory loss, and hip and low back pain. (Id. at 148.) These impairments first bothered her in 1976 and prevented her from working in 1987. (Id.) She tried to work after this; however, if she did not get fired she was not given many hours to work or was put in positions requiring little contact with people. (Id.) She finally stopped working in 1994 when her hip and back pain was unbearable, her anxiety attacks were happening everyday, and her memory was so bad she would forget what she was doing. (Id.) Plaintiff further reported that she sometimes thought of hurting her mother and husband because they mentally hurt her. (Id. at 155.) She would not hurt them, however, and she loved her children. (Id.)

On another form, Plaintiff listed five medications she was taking at the time of the hearing: Glucobryde; Prozac; Seroquel; Ibuprofen; and Advair. (Id. at 112.) The first was prescribed for her diabetes; the second was for depression; the third for psychosis; the fourth for pain; and the fifth for asthma. (Id.)

An earnings report generated for Plaintiff listed income in eight of the fourteen years included. (Id. at 105.) Her highest annual earnings were $4,661.48, in 1993. (Id.) In only two other years did her average annual earnings exceed $1,000.00. (Id.) In only one of the five other years during which she had income did her income exceed $500. (Id.)

Plaintiff's medical records begin in December 1997. That month, Plaintiff was pregnant and was "strongly" advised at a check-up to stop smoking. (<u>Id.</u> at 196.) It was noted that she had a history of asthma. (<u>Id.</u>) At another check-up two weeks later, Plaintiff complained of low back pain radiating down her right leg. (<u>Id.</u> at 173, 192.) She was sent home for bed rest for two days. (<u>Id.</u> at 173.) Plaintiff returned to the hospital two months later with complaints of abdominal pain of three days duration. (<u>Id.</u> at 180.) She described the pain as dull and constant and exacerbated by movement. (<u>Id.</u>) She was then 26 weeks pregnant. (<u>Id.</u>) Given her recent problems with constipation and the lack of any other indication of abdominal pathology, Plaintiff was prescribed a stool softener and something for flatulence. (<u>Id.</u> at 181.)

In March 1998, Plaintiff, still pregnant, went to the emergency room with complaints of vaginal bleeding. (<u>Id.</u> at 171.) It was noted that she had a history of post-partum depression, asthma, and bipolar disorder. (<u>Id.</u> at 172.) She was 5 feet 6 inches tall and weighed 295 pounds. (<u>Id.</u> at 171.) Her medical history included asthma, obesity, and bipolar disorder. (<u>Id.</u> at 172.)

On April 29, Plaintiff went to the Washington University clinics with complaints of throbbing back pain that began at her tailbone and progressed up to the base of her head. (<u>Id.</u> at 246.) This pain began when Plaintiff went home after delivery. (<u>Id.</u>) The physician opined that the pain was a result of the epidural used during delivery. (<u>Id.</u>) She was instructed to return if the pain increased in frequency or intensity. (<u>Id.</u>)

Plaintiff began consulting Dr. Mathew at Psychiatric Care Consultants on June 2, 1998.  (Id. at 235.)  She reported that she had been experiencing psychiatric problems since she was ten to twelve years old.  (Id.)  She had attempted suicide 12 times before she was 17.  (Id.)  She was described as having poor impulse control and as having been diagnosed as bipolar.  (Id. at 235-36.)  She also reported that she had last worked four and one-half years before cleaning houses.  (Id. at 237.)  Her concentration and memory were poor.  (Id. at 238.)  This first session could not be completed because of the children in the room.  (Id.)

On June 30, Plaintiff reported that she was tired.  (Id. at 235.)  She was smoking one to one and one-half packs of cigarettes a day.  (Id.)  On August 26, she reported that she was feeling better on Wellbutrin.  (Id. at 234.)  She was going to start school.  (Id.)

On July 23, Plaintiff went to the emergency room by ambulance after one of her children jumped on her back when she was kneeling.  (Id. at 162.)  It was reported that she had a history of intermittent back pain since 1992.  (Id. at 162.)  She also complained of numbness in both legs.  (Id.)  The diagnosis was acute lumbar spine.  (Id.)  The treatment was medication and an application of heating pads.  (Id.)

The next month, Plaintiff went to the clinic at Washington University with complaints of arthritis pain in her right hip.  (Id. at 206.)  She was taking Wellbutrin and reported periods of depression and anger and alternating periods of insomnia and excess sleep.  (Id.)  She had no suicidal or homicidal ideation.  (Id.)  Her fiancé was not working, and she was being evicted.  (Id.)  She was described as a morbidly obese woman.  (Id. at 207.)  She was currently smoking one-half pack of cigarettes a day.  (Id.)  She had a history of marijuana,

cocaine, acid, and intravenous drug use, but was no longer using these drugs. (Id.) It was recommended she consider an obesity clinic. (Id. at 209.) It was also noted that she was to bring her records from Dr. Mathew because it was unclear whether she had been diagnosed as bipolar or schizophrenic. (Id.) She was to continue taking Wellbutrin. (Id.) Her asthma was stable. (Id.)

On August 31, Plaintiff returned to the Washington University clinics for a skin rash. (Id. at 245.) Her heartburn had resolved with Zantac. (Id.) She was encouraged to exercise and to stop smoking. (Id.)

On September 14, Plaintiff went to the eye clinic at Washington University with complaints of blurred vision for two years. (Id. at 240-43.) She was then taking Wellbutrin for depression; Albuterol for her asthma; Diazepam for anxiety; Zantac for gastritis; and Ibuprofen and Tylenol for arthritis. (Id. at 240.) She had 20/25 vision in each eye, and had never worn glasses. (Id.)

The next year, on July 16, 1999, Plaintiff went to the emergency room at Barnes-Jewish St. Peters Hospital with complaints of acute right hip pain. (Id. at 261- 65.) She also had back pain from her buttocks to her right foot and toes. (Id. at 262.) "Possible disc disease" was listed as a diagnosis. (Id. at 261.) Five hours after admission, Plaintiff, in no apparent distress, was discharged with a prescription for a muscle relaxer and instructions to use a heat pad. (Id. at 263-64.) Her gait was steady. (Id. at 263.) An x-ray of her lumbar spine showed no fracture or acute abnormality, but also showed a transitional vertebrae at the lumbosacral junction. (Id. at 265.) Ten days later, Plaintiff returned with complaints of

acute abdominal pain.  (Id. at 253-60.)  A computerized topography ("CT") scan of her abdomen and pelvis was normal.  (Id. at 260.)  Plaintiff was discharged with instructions to rest and drink plenty of fluids.  (Id. at 253.)

On August 6, Plaintiff went to Christian Hospital with complaints of sharp back pain after a fall the year before.  (Id. at 300, 302.)  The pain had been worse for the past three weeks.  (Id. at 300.)  She reported that a doctor had told her in the past that she had a congenital growth on her hip.  (Id. at 304.)

On November 24, Plaintiff went to Christian Hospital after injuring her back when she tripped over her cat.  (Id. at 282-97.)  She reported numbness in both legs.  (Id. at 282.)  She had a history of depression, hallucinations, and asthma.  (Id.)  An x-ray of her lumbar spine was normal.  (Id. at 289.)  She was given a prescription for Vicodin and a ten-day supply of Naprosyn.  (Id. at 283.)

In the afternoon of December 8, Plaintiff sought treatment at Christian Hospital after feeling dizzy since the morning.  (Id. at 274-80.)  She felt pressure from the back of her head up to her temples.  (Id. at 274.)  Her current medications included Risperdal, Prozac, Vicodin, and Albuterol.  (Id.)

Plaintiff's next medical record is the November 21, 2000, notes of Dr. Kosuri at BJC Behavioral Health.  (Id. at 331-32.)  She informed Dr. Kosuri that she had been treated by Dr. Ahmad, but wanted to change physicians and was out of medication.  (Id. at 331.)  She also reported that she had cut her leg two weeks before after a fight with her husband.  (Id.)  Her last psychiatric admission was at 18 years of age for suicidal ideation.  (Id.)  She had

been self-mutilating until she was 21 years old and pregnant. (Id.) On examination, she appeared alert and oriented to time, place, and person. (Id. at 332.) She had fair eye contact and did not display any flight of ideas. (Id.) She reported feelings of hopelessness and anger. (Id.) She was of average intellect and had fair insight and judgment. (Id.) Dr. Kosuri diagnosed her with major depressive disorder, recurrent, and assessed her Global Assessment of Functioning ("GAF") at 70.[6] (Id.) She was to follow up with a community psychiatrist. (Id.)

On January 18, 2001, Diane McQuade, a social worker with BJC Behavioral Health, prepared a psycho social/clinical assessment of Plaintiff. (Id. at 321-29.) Plaintiff reported that she had been experiencing increased anxiety recently about her husband, his medical condition, their finances, and parenting issues. (Id. at 321.) Her goal was to remain compliant with treatment in order to obtain part-time employment and manage the household expenses. (Id.) Plaintiff was physically abused by her mother until she was 17 years old, emotionally abused by her father and sometimes hit by him, and sexually abused by her uncle when she was 5 or 6 years old. (Id. at 322.) She had attempted to commit suicide four

---

[6]"According to the Diagnostic and Statistical Manual of Mental Disorders 32 (4th Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003). See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)). A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Manual at 34.

times, but the last time was when she was 16 years old.  (Id.)  She had been treated by Dr.

Ryall at Great Rivers Mental Health Services about four years before and was diagnosed as

having bipolar disorder and anxiety.  (Id. at 323.)  Her current medication was 50 milligrams

daily of Prozac.  (Id.)  Her previous drug use included LSD every other day from age 13 to

20 or 21; cocaine, occasionally mixed with heroin or marijuana, from age 14 or 15 to 20 or

21; methamphetamine at age 20 or 21; and marijuana from age 11 or 12 to present.  (Id. at

324.)  Her diagnosis, per Dr. Kosuri, was major depressive disorder, recurrent.  (Id.)  Ms.

McQuade's impression was that Plaintiff would be able to make progress toward obtaining

part-time employment with appropriate medication and assistance from her community

support worker.  (Id. at 326.)

Dr. Kabir treated Plaintiff four times between December 2, 2002, and March 12,

2003, inclusive.  (Id. at 334-37.)  As noted during the second hearing, his notes are generally

illegible.  The notes do include references to Plaintiff's history, including that of being raped

five times and her alcohol and drug use.  (Id. at 337.)  She had formerly engaged in self-

mutilation and, although she had suicidal ideation, she felt she could stay in control.  (Id. at

336.)  She had lived with her husband for three years before they were married and they had

been married for four years.  (Id.)  He was verbally abusive.  (Id.)  She was going to school

to become an art therapist.  (Id.)  Dr. Kabir diagnosed Plaintiff with depressive disorder and

assessed her GAF at 55.[7]  (Id. at 334.)  On January 29, 2003, Plaintiff reported that a

---

[7]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Diagnostic and Statistical

medication, the name of which was illegible, was making her drowsy.  (Id.)  In February, Plaintiff reported that she was crying for no reason and her sleep and appetite were decreased.  (Id. at 335.)  Prozac and Risperdal were prescribed.  (Id.)  The notes of March 12, 2003, generally illegible, indicate that Plaintiff had no thoughts of self-mutilation or suicide.  (Id.)

From July 1, 2002, to February 21, 2003, Plaintiff was treated by Joseph M. Seria, M.D.  (Id. at 338-52.)  Plaintiff first consulted him for an infected ingrown nail.  (Id. at 342.)  Dr. Seria noted that she had been diagnosed with depression/anxiety and was "off" her medications.  (Id.)  Her asthma was described as stable.  (Id.)  She then weighed 299 pounds.  (Id.)  Two blood tests in August showed high glucose levels, indicative of diabetes.  (Id. at 345, 347.)  In October, her weight was down to 276 pounds.  (Id. at 341.)  She was walking eight blocks every day.  (Id.)  She was still "off" her medications for depression and anxiety.  (Id.)  She was cautioned to stop smoking because of her asthma.  (Id.)  X-rays of her cervical spine and shoulder were both negative.  (Id. at 348-49.)  Plaintiff's weight was up to 301 pounds at the next visit, in January 2003.  (Id. at 339.)  She was still smoking and not taking medication for her depression and anxiety.  (Id.)  She had sinus problems.  (Id.)  She had not gone for diabetes counseling as she had been advised to.  (Id.)  On February 13, Plaintiff reported pain in her right hip for the past three weeks.  (Id. at 338.)  Ibuprofen helped a little.

Manual of Mental Disorders at 34.

(Id.)  She also had chest pain down her right arm that lasted 20 minutes to an hour.  (Id.)  A stress test on February 21 was negative for ischemia.  (Id. at 350.)

The medical records before the ALJ included a report of a consultative examinations.

After reviewing Plaintiff's medical records from the Washington University Clinics and Psychiatric Care Consultants, Paul W. Rexroat, Ph.D., evaluated Plaintiff on February 21, 2001.  (Id. at 312-20.)  Plaintiff reported that her mother used drugs, including acid, mushrooms, and marijuana, when pregnant with Plaintiff.  (Id. at 312.)  She further reported that she (Plaintiff) had skipped school to use marijuana and other drugs.  (Id.)  She dropped out of school after the ninth grade.  (Id. at 313.)  Her longest period of employment was one year when she worked at Steak n' Shake.  (Id.)  She first reported that she had stopped using drugs in 1994, but later added that she was still using marijuana every evening to calm her nerves.  (Id.)  Plaintiff had been sexually abused by her uncle when she was in her early teens.  (Id.)  At the age of 18, she was a compulsive liar.  (Id.)  She had also been the victim of two rapes.  (Id.)  She was currently seeing a therapist at the Great Rivers Mental Health Clinic and had been diagnosed with bipolar mood disorder.  (Id.)  She had pain in her neck, shoulders, back, and arms.  (Id.)  She also had asthma, but smoked one to one and one-half packs of cigarettes a day.  (Id.)  She was obese.  (Id.)  She had a normal gait and posture and appeared to have a normal energy level.  Plaintiff reported that she had frequent mood swings from melancholy to rage.  (Id.)  She did not like to go out, did not have any energy, and was a binge eater.  (Id.)  She had not attempted suicide since she was 20 years old.  (Id.)

She contemplated killing her husband when she fought with him, but she did not act on these thoughts.  (<u>Id.</u>)  She heard voices and saw hallucinations.  (<u>Id.</u>)

On examination, she was oriented to person, place, time, and situation.  (<u>Id.</u>)  Her cognitive functioning appeared to be in the low average range of intelligence.  (<u>Id.</u> at 314-15.)  Plaintiff was given the Minnesota Multiphasic Personality Inventory II ("MMPI-2").  (<u>Id.</u> at 315.)  Dr. Rexroat was uncertain if her test scores were invalid or simply reflected her unusual experiences.  (<u>Id.</u>)  He also observed, in part, that she "resent[ed] demands to be placed upon her and often reacts to them in an unfriendly and irritable manner.  She tends to remain limited to a minimum functioning lifestyle."  (<u>Id.</u>)  She worried excessively and overreacted to relatively minor matters.  (<u>Id.</u>)  She had a "high level of antisocial characteristics."  (<u>Id.</u> at 317.)  Dr. Rexroat opined that "the basic problem with [Plaintiff] is her long-term extensive use of a variety of illegal drugs, especially acid. . . .  Polysubstance abuse is allegedly in remission except for her use of marijuana to this day.  Merely stopping her use of marijuana might very well eliminate many of her current symptoms."  (<u>Id.</u>)

On examination, Plaintiff was able to understand and remember simple instructions, interact socially, and adapt to her environment.  (<u>Id.</u>)  She could do "a fair job of sustaining concentration and persistence with simple tasks."  (<u>Id.</u>)  His diagnosis was polysubstance dependence, allegedly in remission except for current dependence on marijuana; marijuana

dependence; major depression, recurrent, with psychotic features, probably secondary to long-term polysubstance abuse." (Id. at 318.) Her GAF was 69.[8] (Id.)

The ALJ also had before him a Mental Medical Source Statement completed on April 3, 2003, by Verma Chewe. (Id. at 354-57.) She assessed Plaintiff's limitations as "marked" in the areas of her ability to cope with normal work stress, behave in an emotionally stable manner, maintain regular attendance and be punctual, complete a normal workday and workweek without interruptions from symptoms, and work in coordination with others. (Id. at 354-55.) Plaintiff's limitations were "moderate" in the areas of her ability to function independently, maintain reliability, relate in social situations, interact with general public, accept instructions and respond to criticism, maintain socially acceptable behavior, make simple work-related decisions, sustain an ordinary routine without special supervision, and respond to changes in the work setting. (Id.) Ms. Crewe determine that Plaintiff had had one or two episodes of decompensation during the past year that lasted at least two weeks. (Id. at 356.) These limitations existed at the assessed severity as of April 2002, the date of the therapeutic session. (Id.) Her highest GAF in the previous year was 50,[9] as was her most recent GAF. (Id. at 357.) This assessment was also as of April 2002. (Id.) Ms. Crewe had recommended a case worker for Plaintiff and her family before her case had been closed. (Id.)

---

[8]See note 6, *supra*.

[9]A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Manual at 34.

David W. Bailey, Ph.D., did not complete a Psychiatric Review Technique Form on Plaintiff in June 2000 on the ground that he had insufficient evidence to do so.  (<u>Id.</u> at 133-41.)  Specifically, Plaintiff had failed to keep the first appointment for her consultative examination and the rescheduled appointment.  (<u>Id.</u> at 132.)

## The ALJ's Decision

The ALJ first summarized in detail Plaintiff's testimony and the medical evidence in the record.  (Id. at 12-18.)  He then noted that there was evidence that Plaintiff did not see a psychiatrist, psychologist, therapist, or counselor on a regular basis.  (Id. at 19.) She apparently did not see anyone between Dr. Kosuri's assessment in November 2000 and Ms. McQuade's assessment in January 2001 and between that assessment and the four sessions with Dr. Kabir beginning in December 2002, with the exception of the consultative examination in February 2001 and the session, apparently in July 2002, with Ms. Crewe. (Id.)  The ALJ further noted that a 1998 application for benefits had been denied for Plaintiff's failure to cooperate and her pending application had initially been denied for her failure to attend a consultative examination.  (Id.)  She told Dr. Rexroat that she had been a compulsive liar.  (Id. at 19-20.)  She alleged she had frequent hallucinations, but denied such to Dr. Kosuri.  (Id. at 20.)  Her reports of her daily activities were inconsistent.  (Id.)  She reported that she had to work hard at school because she was dyslexic; however, she did not mention this until the April 2003 hearing and had home schooled her children for two years. (Id.)  The ALJ concluded that:

> [b]ased on the evidence as a whole, not just the objective medical findings or personal observations, the [ALJ] does not find the allegations of debilitating mental and physical impairments fully credible.  The claimant's limited use of treatment and medication, the objective medical findings, her activities, her lack of work restrictions by a treating physician, and her appearance and demeanor are inconsistent with her alleged complaints.

(Id.)

- 23 -

The ALJ further concluded that the medical evidence established that Plaintiff had morbid obesity, diabetes mellitus, hypercholesterolemia, asthma, and a history of depression, polysubstance abuse, personality disorder, and anxiety, but did not have an impairment or combination of impairments that were listed in, or medically equal to one, listed in the regulations. (Id. at 21.) Moreover, Plaintiff had the exertional capacity to perform sedentary and light work and could answer simple questions and get along with other workers. (Id.) She required a low stress environment. (Id.) Based on the VE's reply to his hypothetical question, the ALJ found that Plaintiff was not disabled because she could perform past relevant work of a laundromat attendant, restaurant waitress, stock/sales person, busser, cashier, and hostess. (Id.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 416.920, 404.1520. See also **Ramirez v. Barnhart**,

292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002); **Cox v. Apfel**, 160 F.3d 1203, 1206 (8th Cir. 1998). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 416.920(d), 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments[,]" **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added), and requires "a function-

by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,'" **Depover v. Barnhart**, 349 F.3d 563, 565 (8th Cir. 2003) (quoting S.S.R. 96-8p)). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility regarding subjective pain complaints. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). And, although a claimant need not be reduced to life in front of the television in order to prove that pain precludes all productive activity, see **Baumgarten v. Chater**, 75 F.3d 366, 369 (8th Cir.

1996), "[t]he mere fact that working may cause pain or discomfort does not mandate a finding of disability," **Jones v. Chater**, 86 F.3d 823, 826 (8th Cir. 1996) (alteration added).

After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  See **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).  The decision of an ALJ who seriously considers, "but for good cause expressly discredits, a claimant's subjective complaints of pain, is not to be disturbed."  **Haggard v. Apfel**, 175 F.3d 591, 594 (8th Cir. 1999).

The burden at step four remains with the claimant.  See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824.  See also 20 C.F.R. §§ 416.920(f), 404.1520(f).  The Commissioner may meet her burden by referring to the medical-vocational guidelines (the "Grids") or by eliciting testimony by a vocational expert.  **Pearsall**, 274 F.3d at 1219.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a

whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d

1253, 1255 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a decision." **Cox**, 160 F.3d at

1206-07. When reviewing the record to determine whether the Commissioner's decision is

supported by substantial evidence, however, the court must also take into account whatever

in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050

(8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not

reverse that decision merely because substantial evidence would also support an opposite

conclusion. **Dunahoo**, 241 F.3d at 1037; **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir.

1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998). Thus, if "it is possible to draw

two inconsistent positions from the evidence and one of those positions represents the

agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244

F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

**Discussion**

Plaintiff argues that the ALJ's decision must be reversed because he failed to comply

with the Appeals Council remand order. Specifically, he improperly evaluated her mental

impairment and assessed her residual functional capacity. The Commissioner disagrees.

Mental Impairment. In its order remanding the case, the Appeals Council directed the

ALJ to, inter alia, evaluate the severity or effects of Plaintiff's mental impairments pursuant

to 20 C.F.R. § 416.920a.

Section 416.920a sets forth the "special technique" to be used during the administrative review process when evaluating the severity of mental impairments in adults. 20 C.F.R. § 416.920a(a). This technique requires that the claimant's "pertinent symptoms, signs, and laboratory findings" be evaluated to determine whether the claimant has a medically determinable impairment. Id. § 416.920a(b)(1). This was done. Based in part on Dr. Rexroat's evaluation of Plaintiff, the ALJ found she had a history of depression, polysubstance abuse, personality disorder, and anxiety.

The degree of functional limitation resulting from this impairment must then be rated. Id. §§ 416.920a(b)(2) and (c). This rating follows a specific format, identifying four broad functional and analyzing the degree of limitation in each area imposed by the mental impairment. Id. §§ 416.920a(c)(3) and (4). The degree of limitation in the first three areas is rated on a five-point scale: "[n]one, mild, moderate, marked, and extreme." Id. § 416.920a(c)(4). The degree of limitation in the fourth area, episodes of decompensation, is rated on a four-point scale: "[n]one, one or two, three, four or more." Id. A rating of "none" or "mild" in the first three categories and "none" in the fourth will generally result in a finding that the mental impairment at issue is not severe. Id. § 416.920a(d)(1). On the other hand, if the mental impairment is severe, the medical findings about that impairment and the resulting limitations in the four functional areas are to be compared "to the criteria for the appropriate listed mental disorder." Id. § 416.920a(d)(2). If the claimant has a severe mental impairment that does not meet or equal the severity of any listing, then the claimant's residual functional capacity is to be assessed. Id. § 416.920a(d)(3). The ALJ found that

Plaintiff's mental impairments were not of listing-level severity and then proceeded to assess her residual functional capacity.

Section 416.920a(e) requires that the application of this technique be documented. An ALJ is to document the application in his or her decision.  Id.

Plaintiff argues that there is no evidence in the record that the ALJ followed the required technique.  Plaintiff notes that although the ALJ cited Dr. Barclay's testimony, the ALJ found, contrary to that testimony, that Plaintiff had a severe mental impairment.  And, Dr. Barclay did not testify about whether Plaintiff had any episodes of decompensation, one of the four functional areas.

Plaintiff's first assignment of error is without merit.  The ALJ could properly accept the diagnosis of the consulting examiner, Dr. Rexroat, over the opinion of the non-examining medical expert, Dr. Barclay.  Moreover, to do otherwise would be error.  Dr. Barclay testified that the records did not reflect that Plaintiff had any marked restriction in the first three functional areas.  In order for a mental impairment to be considered as not severe, the degree of limitation in those areas must be less than moderate, and "moderate" is less than marked.

Plaintiff's second assignment of error is also unavailing.  "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20 C.F.R. Pt. 404, Subpt. P, App.1, Listing 12.00(C)(4).  Such episodes "may be

demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system . . ." Id.

In obedience to the remand order from the Appeals Council, the ALJ called a medical expert, Dr. Barclay, to testify. After affirming that he had reviewed Plaintiff's medical records, Dr. Barclay testified about what those records reflected about Plaintiff's functioning. The substance of his analysis mirrors that required by the regulations. He then compared her functioning to the criteria for Listings 12.04 and 12.08 and opined that she satisfied neither. The only thing lacking in his testimony, and in the ALJ's subsequent decision, is a clearly labeled analysis of the area of episodes of decompensation.

"[A]n arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where . . . the deficiency had no practical effect on the outcome of the case." **Forte v. Barnhart**, 377 F.3d 892, 896 (8th Cir. 2004) (first alteration added; second in original) (interim quotations omitted). Accord **Strongson v. Barnhart**, 361 F.3d 1066, 1072 (8th Cir. 2004). The failure of the ALJ to specifically discuss the area of episodes of decompensation reflects only a deficiency in "opinion-writing technique" and not any reversible disregard of the remand order. Cf. **Montgomery v. Shalala**, 30 F.3d 98, 99-101 (8th Cir. 1994) (remanding case to ALJ that had failed to follow psychiatric review technique on grounds that such failure was not a harmless error; ALJ's

question to VE did not accurately summarize claimant's mental status and ALJ had failed to consider important effect of that status).

Residual Functional Capacity.  Plaintiff further argues that the ALJ failed to provide in his decision a required discussion of how the evidence supported his decision about her RFC.  In support of this argument, Plaintiff contends that the lack of evidence supporting additional limitations in her RFC is not enough to satisfy the Commissioner's burden of proof.

As noted above, however, the burden of proof on the question of a claimant's RFC remains with the claimant.  See **Stormo v. Barnhart**, 377 F.3d 801, 805 (8th Cir. 2004); **Pearsall**, 274 F.3d at 1217; **Banks**, 258 F.3d at 824.  The ALJ's assessment of Plaintiff's RFC is supported by the evidence in the record.  The burden to establish additional limitations was Plaintiff's.

## Conclusion

The Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.  "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently."  **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (alterations added) (interim citations omitted).  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED

and this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of September, 2005.